FILED

APR 17 2018

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

[UNDER SEAL] )
)
) 1:18-cv-02744
) Judge Ruben Castillo
Plaintiffs, ) Magistrate Judge Mary M. Rowland
)
v. ) **FILED IN CAMERA AND**
) **UNDER SEAL AND PURSUANT**
[UNDER SEAL] ) **TO THE FALSE CLAIMS ACT**
)
Defendants. )

**DOCUMENT TO BE KEPT UNDER SEAL**

David J. Fish
Illinois State Bar No. 6269745
Kimberly Hilton
Illinois State Bar No. 6303527
John Kunze
Illinois State Bar No. 6322643
The Fish Law Firm, P.C.
Fifth Avenue Station
200 E. 5th Avenue Suite 123
Naperville, IL 60563
Phone: (630) 355-7590
Fax: (630-778-0400
dfish@fishlawfirm.com

Attorney for [under seal]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel., KAREN BLOOMQUIST,<br><br>Plaintiffs,<br><br>v.<br><br>MEDSTAR LABORATORY, INC. SRINIVAS C. KOTA MD, S.C. d/b/a PREMIER PHYSICIANS, SRINIVAS C. KOTA, MD,<br><br>Defendants. | ) | Case No.:<br><br>JURY TRIAL DEMANDED<br><br>**FILED IN CAMERA AND UNDER SEAL AND PURSUANT TO THE FALSE CLAIMS ACT** |

**<u>Complaint</u>**

NOW COMES Plaintiff-Relator KAREN BLOOMQUIST ("Relator" or "Bloomquist"), by and through their attorneys, against Defendants MEDSTAR LABORATORY, INC. ("Medstar") and SRINIVAS C. KOTA MD, S.C. d/b/a Premier Physicians ("Premier Physicians") and SRINIVAS C. KOTA, MD in his individual capacity ("Dr. Kota") (collectively, "Defendants") [1] on behalf of the UNITED STATES OF AMERICA, and states as follows:

**<u>Nature of the Case</u>**

1. This is an action brought under, *inter alia,* the federal False Claims Act, 31 U.S.C. §3729, et seq. (the "FCA" or "False Claims Act"), as amended by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), and the Patient Protection and Affordable Care Act of 2010 to recover damages and civil penalties from Defendants on behalf of the United States of America,

---

[1] Dr. Kota and Premier Physicians are collectively referred to herein as the "Premier Physicians".

("the Government"), and individually. It also seeks to recover unpaid overtime premiums under the Fair Labor Standards Act and the Illinois Minimum Wage Law.

2. The Relator is an original source within the meaning of 31 U.S.C. § 3730(e)(4)(b) and has direct and independent knowledge of the allegations set forth in this Complaint.

3. Pursuant to 31 U.S.C. § 3730(b)(2), Relator has provided the Government with a copy of the Complaint and a written disclosure of substantially all material, evidence, and information in her possession.

## **Introduction**

4. From at least 2017 to the present, and upon information and belief, Defendants have intentionally and knowingly submitted false and fraudulent claims to Medicare. As set forth below, Defendants' actions and/or omissions include, but are not limited to false claims to Medicare for calls that were fraudulently billed to Medicare and the payment and receipt of kickbacks in exchange for patient referrals. Such actions violate the federal Anti-Kickback statute. 42 U.S.C. §1320a-7b(b).

## **Jurisdiction and Venue**

5. This Court has jurisdiction over the subject matter of this action pursuant to 31 U.S.C. §§ 3730(b)(1) and 1331, and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

6. This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. §§ 3732(a), 3730(b) and because they transacted business within this district and have committed acts within the district that violated 31 U.S.C. § 3729. This Court has jurisdiction over the subject matter of this action pursuant to 31 U.S.C. §§ 3730(h) and 1331.

7. Venue is proper in this Court pursuant to 31 U.S.C. §§ 3732(a), 28 U.S.C. §§ 1391 and 1395(a) because at all times relevant to this Complaint Defendants regularly conducted business within this district and maintained employees and/or offices within this District. In addition, statutory violations alleged herein occurred in the Northern District of Illinois.

8. This action is not based on a public disclosure. It is based on information that is within the direct and independent knowledge of the Relator. Relator has provided that information to the Government prior to filing this action.

**Parties**

9. Relator is an Illinois resident. She was hired and worked as a Medical Assistant for Premier Physicians from March 13, 2017 and until December 5, 2017. Relator performed blood draws, injections, recorded vitals, performed cosmetic procedures, and performed various administrative tasks.

10. Relator brings this action based on her direct, independent, and personal knowledge and also on information and belief.

11. Srinivas C. Kota MD, S.C. does business as "Premier Physicians" and is an Illinois corporation with a medical office located at 726 S. Weber Rd., Bolingbrook, Illinois 60490. It utilizes the assumed name "Premier Physicians Center for Wellness and Occupational Therapy".

12. Premier Physicians is a medical office that provides internal medicine services to adult patients. Premier Physicians regularly bills Medicare for full payment of medical services rendered.

13. Defendant Dr. Kota works in Bolingbrook, IL and specializes in Internal Medicine. Defendant Dr. Kota is affiliated with Edwards Hospital, Adventist Bolingbrook Hospital and

Provena Saint Joseph Hospital. He is president of Srinivas C. Kota MD, S.C.. and, upon information and belief, is its sole owner.

14. Medstar Laboratories Inc. is an Illinois corporation offering medical diagnostic specimen testing. It is headquartered at 4531 Harrison St., Hillside, Illinois 60162 and has locations in Joliet, Elmwood Park, and Merrillville, Indiana. Medstar also employed Relator, described in detail herein.

**The False Claims Act**

15. The FCA prohibits knowingly presenting, or causing to be presented, to the federal government a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1) (1986) and 31 U.S.C. § 3729(a)(1)(A) (2009).[2] In addition, the FCA prohibits knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B). The FCA further prohibits knowingly concealing or knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property back to the federal government. 31 U.S.C. § 3729(A)(1)(G).

16. The FCA also prohibits conspiring with another person to defraud the Government by getting a false or fraudulent claim allowed or paid by the Government. 31 U.S.C. § 3729(A)(1)( C ).

[2] Congress amended the FCA as a part of the Fraud Enforcement Recovery Act of 2009 ("FERA") on May 20, 2009, making certain amendments retroactive, including 31 U.S.C. § 3729(a)(1)(B). It amended the FCA as part of the Patient Protection and Affordable Care Act on March 23, 2010.

17. The term "knowingly" as used in the FCA means that a person, with respect to information, (i) has actual knowledge of the information, (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b). No proof of specific intent to defraud is required to show that a person acted knowingly under the FCA. *Id.*

18. Any person who violates the FCA is liable for civil penalties up to $11,000 per false claim prior to November 2, 2015, as adjusted for inflation, plus three times the amount of damages that the Government sustains as a result of the defendant's actions. 31 U.S.C. § 3729(a). These civil penalties increase to up to $21,563 per false claim for claims submitted after November 2, 2016 and including treble damages. 28 C.F.R. §85.5.

19. A violation of the Anti-Kickback Act is a per se violation of the FCA. 42 U.S.C. § 1320a–7b(g).

**The Stark Law**

20. The "Stark Law" prohibits physicians from referring Medicare patients to health care entities with which they have a financial relationship. 42 U.S.C. § 1395, et. seq.

21. The Stark Law is a strict liability statute and requires no scienter. 42 U.S.C. § 1320a-7b(b).

22. The Stark Law's purpose of the statute is to reduce excess costs incurred by the Medicare program due to overutilization of services, anti-competitive behavior, and the corruption of medical judgment caused by physicians' financial self-interests.

23. A person or entity found to be in violation of the Stark Law is subject to civil and administrative sanctions, including exclusion from participation in federal health care programs. 42 U.S.C. §1395nn(g)(3); 42 U.S.C. § 1320a-7a(a).

**The Anti-Kickback Act**

24. The Anti-Kickback Law ("AKL") was designed to prevent conflicts of interest arising between and among referral sources and other health care providers and entities. 42 U.S.C. § 1320a-7b(b).

25. The AKL prohibits a person or entity from "knowingly and willfully" paying remuneration to another person or entity to induce the recipient to, inter alia, refer an individual to a person or entity for the purpose of furnishing a service or item paid for by a federal health care program. 42 U.S.C. § 1320a-7b(b)(2).

26. A person found to have violated the AKL is subject to criminal and civil sanctions, including exclusion from participation in federal health care programs. 42 U.S.C. §§ 1320a-7b(b)(1)–(2), 1320a-7a(a)(7), 1320a-7(b)(7).

27. The AKL prohibits the payment, in any form, whether direct or indirect, made in part or in whole to induce or reward the referral or generation of federal health care business. The AKS prohibits the offer or payment of "anything of value" in return for referrals. A "thing of value" is defined broadly to include payment in cash or kind. The AKL extends equally to the solicitation or acceptance of payments and to offers to pay and to actual payments for referrals. The AKL was enacted because of Congressional concerns that payments made in return for referrals would lead to overutilization.

28. In addition to prohibiting payments designed to induce referrals, the AKS prohibits the entity receiving a prohibited referral from presenting or causing to be presented to Medicare any claim for referrals that are induced by kickbacks. In 2010 the AKS was amended to provide that a claim that includes items or services resulting from kickback violations are deemed "false" under the FCA. 42 U.S.C. § 1320a-7b(g).

29. In 2010, the Patient Protection and Affordable Care Act of 2010 ("PPACA") amended the Anti-Kickback Act to clarify that a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of the False Claims Act. 42 U.S.C.§ 1320a–7b(g).

30. Compliance with the AKA is a condition of payment for both Medicare and Medicaid.

31. The United States, through the Department of Health and Human Services (DHHS), administers the Supplementary Medical Insurance Program for the Aged and Disabled established by Part B, Title XVIII, of the Social Security Act under 42 U.S.C. § 1395j-1395w ("Medicare Part B Program"). The objective of the Medicare program is to provide medical insurance for covered services to any person 65 years or older, to certain disabled person, and to individuals with chronic renal disease who elect coverage under the program. DHHS has delegated the administration of the Medicare Program to its component agency, the Centers for Medicare and Medicaid Services ("CMS").

32. The Medicaid Program is a joint federal-state program formed under Title XIX of the Social Security Act. 42 U.S.C. 1396 et seq. As a prerequisite to enrollment as a provider in the Medicaid Program, medical providers are required to enter into provider agreements and agree, among other things, to comply with federal and state provider participation requirements as a condition of federal and state funding. 42 U.S.C. § 1396a(w).

33. Part B of the Medicare Program is a 100% federally subsidized health insurance system for disabled persons or persons who are 65 or older. Eligible persons aged 65 or older may enroll in Part B of the Medicare Program to obtain benefits in return for payments of monthly premiums as established by DHHS. The benefits covered by Part B of the Medicare program

include medical treatment and services by physicians. An enrolled individual who obtains a covered medical service can either pay for the medical service himself, and request reimbursement of 80% of the reasonable charge, or assign the right to reimbursement to the physician providing the service, who collects as an assignee of the beneficiary under 42 U.S.C. § 1395(b)(3)(B)(ii). The funds to reimburse claims for reimbursement originate from the Medicare Trust Fund.

34. Medical treatment and services by physicians are generally reimbursable under the Medicare Part B Program if the services provided are reasonable and medically necessary. The physician or entity seeking reimbursement, however, must meet certain obligation. These obligations include the following duty to:

a. Bill Medicare for only reasonable and necessary medical services. 42 U.S.C. § 1395y(a)(1)(A);
b. Not make false statements or misrepresentations of material facts concerning requests for payment under Medicare. 42 U.S.C. § 1320a-7b(a)(1) & (2); 1320a-7; 1320a-7a;
c. Provide economical medical services, and then, only where medically necessary. 42 U.S.C. § 1320c-5(a)(1);
d. Provide evidence that the service given is medically necessary. 42 U.S.C. §1320c-5(a)(3);
e. Assure that such services are not substantially in excess of the needs of such patients. 42 U.S.C. § 1320a-7(b)(6) & (8);
f. Not submit or cause to be submitted bills or requests for payment substantially in excess of the physician's usual charges for the same treatment or services. 42 U.S.C. § 1320a-7(b)(6)(A);
g. Certify when presenting a claim that the service provided is a medical necessity. 42 U.S.C. § 1395n(a)(2)(B); and
h. Not as a matter of billing policy waive co-payment amounts in violation of the federal anti-kickback and self-referral statutes. 42 U.S.C. § 1320a-7a(a)(5); 42 U.S.C. § 1320a-7a(i)(6).

**Office of Inspector General Special Fraud Alert Relating to Laboratory Payments To Physicians:**

35. On January 25, 2014, the Office of the Inspector General issued a "Special Fraud Alert: Laboratory Payments to Referring Physicians".[3] It explains that "we have repeatedly

[3] https://oig.hhs.gov/fraud/docs/alertsandbulletins/2014/OIG_SFA_Laboratory_Payments_06252014.pdf

emphasized that providing free or below-market goods or services to a physician who is a source of referrals, or paying such a physician more than fair market value for his or her services, could constitute illegal remuneration under the anti-kickback statute." It went on to explain that:

> "Arrangements in which laboratories provide free or below-market goods or services to physicians or make payments to physicians that are not commercially reasonable in the absence of Federal health care program referrals potentially raise four major concerns typically associated with kickbacks—corruption of medical judgment, overutilization, increased costs to the Federal health care programs and beneficiaries, and unfair competition. This is because such transfers of value may induce physicians to order tests from a laboratory that provides them with remuneration, rather than the laboratory that provides the best, most clinically appropriate service. Such transfers of value also may induce physicians to order more laboratory tests than are medically necessary, particularly when the transfers of value are tied to, or take into account, the volume or value of business generated by the physician. We are particularly concerned about these types of arrangements because the choice of laboratory, as well as the decision to order laboratory tests, typically is made or strongly influenced by the physician, with little or no input from patients."[4]

**The Illinois False Claims Act**

36. The Illinois False Claims Act makes it unlawful to (A) knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval; (B) knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim; or (C) conspire to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G).

37. The State of Illinois administers Medicaid through the Illinois Department of Healthcare and Family Services (DHFS). the United States provided funds to the State of Illinois

---

[4] The OIG has opined that even in a bona fide arrangement where a laboratory places its employee in a physician office (and this does not appear to at all resemble the true nature of the arrangement with Bloomquist), where the employee performs non-laboratory "clerical or medical functions not directly related to the collection or processing of laboratory specimens, a strong inference arises that he or she is providing a benefit in return for the physician's referrals to the laboratory. In such a case, the physician, the phlebotomist, and the laboratory may have exposure under the anti-kickback statute. This analysis applies equally to the placement of phlebotomists in other health care settings, including nursing homes, clinics, and hospitals. 59 Fed. Reg. 242 (December 19, 1994)." October 2, 1997 letter available at: https://oig.hhs.gov/fraud/docs/safeharborregulations/freelabs100297.htm (Last visited, April 9, 2018).

through the Medicaid program, pursuant to Title XIX of the Social Security Act, 42 U.S.C. §1396 et seq. The FMAP for the State of Illinois, the percentage of Illinois Medicaid funds contributed by the federal government, is 50%.

38. Enrolled providers of medical services to Medicaid recipients, including Defendants, are eligible for and have in fact collected reimbursement for covered services submitted for payment under the provisions of Title XIX of the 1965 Amendments to the Federal Social Security Act. As condition of participating in the Medicaid program, enrolled providers such as Dr. Kota, agree to abide by the rules, regulations, policies and procedures governing reimbursement, and to keep and allow access to required records and information.

## Defendants' Fraud

### A. Premier Physicians' employees were paid a "salary" from Medstar which in realty was a kickback to Premier Physicians not based upon any fair market value of services.

39. Bloomquist was hired by Premier Physicians as a Medical Assistant in March of 2017. Once hired, she was told by Indira Kota, the office manager and Dr. Kota's wife, that Medstar would pay for a portion of her compensation. Bloomquist was purportedly paid by Premier Physicians at a rate of $15.25 per hour.

40. Each two-week period starting on March 12, 2017 and through end of her employment, she received from Medstar a separate paycheck. It included on her pay stub a set "salary" of $560.00 paid by Medstar. The paystubs were identical in that each reported a "salary" of $560.00 by two-week period.

41. All work Bloomquist performed was at the Premier Physician facility. Bloomquist was only in a Medstar facility once, at a meeting at Medstar's Hillside location. This meeting was attended by over 50 phlebotomists and it concerned procedures of drawing blood. It lasted a few hours. Other than that single visit, she never was at a Medstar facility.

42. Medstar's payment did not in any way reflect the actual work performed by Premier Physician employees or fair market value. Premier Physicians did not track the hours employees spent performing lab related tasks per week. At $15.25 per hour, Medstar was paying for nearly 37 hours of work per two weeks (assuming a $15.25 hour-rate). Bloomquist estimates that she spent no more than 5-8 hours per week performing lab related work.

43. More to the point, however, for the work that she performed, it was entered into Premier Physicians' system for billings. Bloomquist, for example, would bill on Premier Physician's EMR system as a routine venipuncture which is CPT Code 36415 so Premier Physicians would get paid for that work.

44. Premier Physicians referred blood and urine specimen testing to Medstar. Relator estimates that 95% of Premier Physicians' patients that utilized laboratory services had their lab work sent to Medstar.

45. Based upon Bloomquist's observations, Dr. Kota ordered laboratory work for the vast majority patients.

46. Specimens for Medstar lab testing would be placed in a lock box located on the outside of Premier Physician's location. The specimens would then be picked up by Medstar. Medstar would also leave documents for Premier Physicians in the lock box. This included paychecks for Bloomquist and other employees, and bills and invoices for Premier Physicians. Bloomquist knows what was put in the lock box because she would retrieve these items from the box and give them to Indira Kota.

47. Bloomquist was aware that other Premier Physician employees were paid the same way as she was paid. Bloomquist knows this because she would see paychecks addressed to them in the lockbox when she retrieved documents.

**B. Medstar provided free services to Premier Physicians and Dr. Kota.**

48. On a regular basis, Medstar provided free testing services to benefit Premier Physicians and Dr. Kota. Employees would write "complementary employee" or words to that effect on paperwork sent with testing that was for the benefit of Premier Physicians or Dr. Kota.

49. By way of example, in November 2017, Bloomquist suffered a minor work accident when she stuck herself with a needle that had been used on a patient. She had tests performed to confirm that she was not contaminated. A Premier Physicians supervisor instructed her to indicate it was a complementary test so that Premier Physicians would not be charged when Medstar did the testing.

50. Dr. Kota himself frequently had blood testing done and submitted to Medstar for testing and it would be performed as a complementary basis. If a bill was sent from Medstar, it was retrieved by Bloomquist out of the Medstar lock box. When this occurred Indira Kota instructed Bloomquist to give these bills to her. Indira told Bloomquist that she would call Medstar to "take care" of the billing, Bloomquist understood this to mean that Indira would call Medstar to have the tests done for no charge to Dr. Kota.

51. The testing does not meet the requirements for a proper professional courtesy. See, 42 CFR §411.357(o) & (s).

52. The free testing services were valuable services that would have resulted in substantial charges from Medstar to Premier Physicians had they been charged at fair market value.

**C. Medstar provided Premier Physicians with free supplies.**

53. Bloomquist would often place supplies orders with Medstar for Premier Physicians when supplies ran out. Bloomquist would write a list of general office medical supplies Premier Physicians needed and was directed by Premier Physicians to order some of these supplies from

Medstar. Medstar would supply Premier Physicians with urine cups, blood tubes, blood draw needles, cotton balls and pads, alcohol wipes, and band-aids.

54. Some of these supplies were used for non-lab purposes. For example, if immunizations were given, then they would utilize the free alcohol wipes, cotton balls, and band-aids.

55. Premier Physicians was very reluctant to order supplies from other sources, presumably because of the cost. However, there was never a pushback on ordering supplies from Premier Physicians because they were free. While some of these supplies were in fact utilized for lab testing services, there was not restriction on them being utilized for other purposes.

**D. Premier Physicians Paid Non-Physician Employees $100 Bonuses For Getting Patients To Take Tests.**

56. For every 10 patients that Bloomquist and other non-physician employees got to sign up for a PAD test, which is a medical diagnostic test, they were paid a $100 bonus by Premier Physicians. Given the bonuses, many of the patients were urged to have this test.

57. As a result herein, Premier Physicians shared its medical fee income with non-physicians.

**E. Premier Physicians billed Medicare for Chronic Care Management calls for longer than calls actually took.**

58. Some Premier Physician patients were part of the Chronic Care Management ("CCM") Medicare Program. Under this program, patients were to be called monthly for a 20-minute phone call to discuss medications and health conditions.

59. Bloomquist was directed to bill each call for 20 minutes, but estimates that these calls actually lasted only 5 to 10 minutes. Most of the time, the calls of Bloomquist and others were not that long.

60. Bloomquist and the other medical assistants and Premier Physicians would make these calls.[5]

**Count I**
**Violation of False Claims Act**

61. Plaintiff-Relator realleges the preceding paragraphs as if fully set forth herein.

62. 31 U.S.C. §3729(a)(1)(A) provides liability for any person who knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

63. On May 20, 2009, 31 U.S.C. § 3729(a) was amended to provide, in relevant part, liability for: (1) any person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.

64. Defendants knowingly presented or caused to be presented false and fraudulent claims for payment or approval to Medicaid and the United States.

65. Defendants knowingly caused to be presented, directly or indirectly, false and fraudulent claims for payment or approval to the United States, including claims for services that were not performed or were performed while Relator was performing duties for Medstar.

66. Defendants knew these claims for payment were false or fraudulent, or were deliberately ignorant of the truth, or acted in reckless disregard of whether claims were true.

---

[5] See, https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/ChronicCareManagement.pdf "CPT 99490 Chronic care management services, at least 20 minutes of clinical staff time directed by a physician or other qualified health care professional, per calendar month, with the following required elements: • Multiple (two or more) chronic conditions expected to last at least 12 months, or until the death of the patient • Chronic conditions place the patient at significant risk of death, acute exacerbation/ decompensation, or functional decline • Comprehensive care plan established, implemented, revised, or monitored".

67. Because of these false or fraudulent claims presented or caused to be presented by the Defendants, the United States has suffered damages.

68. Both Defendants are jointly and severally liable to the United States for treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each false claim presented or caused to be presented by Defendants prior to November 2, 2015, between $10,781 and $21,563 per false claim thereafter and between $10,957 and $21,916 for each false claim presented or caused to be presented after February 3, 2017.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against the Defendants as follows:

1. Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729, *et seq*;
2. That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged in this complaint, as 31 U.S.C. § 3729, *et seq* provides;
3. That civil penalties of $5,000 to $10,000 be imposed for each and every false claim that the Defendants caused to be presented to the United States prior to November 2, 2015 and between $10,781 and $21,563 per false claim thereafter, and between $10,957 and $21,916 for each false claim presented or caused to be presented after February 3, 2017, and including treble damages.
4. Relator be awarded the maximum relator's share allowed pursuant to the False Claims Act, 31 U.S.C. § 3730(d);
5. Relator be awarded all costs of this action, including attorney's fees, costs, and expenses pursuant to 31 U.S.C. § 3730(d);
6. Defendants be enjoined from concealing, removing, encumbering, or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court; and
7. That this Court award the United States and the Relator such other relief that it deems just and proper.

## Count II
## Anti-Kickback Violations

69. Plaintiff-Relator realleges the preceding paragraphs as if fully set forth herein

70. From at least 2017, Defendant Medstar knowingly paid remuneration directly or indirectly, overtly or covertly in cash or in kind to physicians, including at a minimum to the other defendants herein, to induce them to purchase or order goods covered in whole or in part in violation of the Anti-Kickback Law.

71. These payments were in the form of subsidizing employee salaries, providing free services, and providing materials at a cost of less than fair market value.

72. As a result, the government has been damaged.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against the Defendants and award all relief available under the law.

**Count III**
**Stark Law Violations**

73. Plaintiff-Relator realleges the preceding paragraphs as if fully set forth herein

74. From at least 2017, Defendant Medstar knowingly paid remuneration directly or indirectly, overtly or covertly in cash or in kind to physicians, including at a minimum the other defendants herein, to induce them to purchase or order goods covered in whole or in part in violation of the anti-Kickback Law.

75. These payments were in the form of subsidizing employee salaries, providing free services, and providing materials at a cost of less than fair market value.

76. As a result, the government has been damaged.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against the Defendants and award all relief available under the law.

**Count IV**
**Violations of the Illinois False Claims Act**

77. Plaintiff-Relator realleges each and every allegation contained in the preceding paragraphs as thought fully set forth herein.

78. This is a claim for treble damages and penalties under the Illinois False Claims Act.

79. By virtue of the acts described above, Defendants knowingly presented or caused to be presented false or fraudulent claims to the Illinois State Government for payment or approval.

80. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records or statements and omitted material facts to induce the State of Illinois to approve and pay or subsidize such false and fraudulent claims.

81. As a result, Illinois State monies were lost through the payment of such false and fraudulent claims.

82. By reasons of the Defendants' acts, the State of Illinois has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

Additionally, the Illinois State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**WHEREFORE,** Relator prays for judgment against the Defendants as follows:

1. Defendants cease and desist from violating the IFCA;
2. This Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of the IFCA.
3. This Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Illinois has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of the IFCA.
4. This Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Illinois has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of 740 Ill. Comp. Stat. § 175/3(a);

5. Relator be awarded the maximum amount allowed under the IFCA;
6. Relator be awarded her relator's share under the IFCA;
7. Relator be awarded all costs of this action, including attorneys' fees and expenses; and
8. Relator recover such other relief as the Court deems just and proper.

**COUNT V – Fair Labor Standards Act**
(against Premier Physicians and Dr. Kota Only)

83. The Plaintiff re-alleges and incorporates by reference the prior paragraphs.

84. As a result of the forgoing scheme, the Defendants split up the Plaintiff's paycheck wherein only a portion of her pay was paid on each check (i.e., a portion was paid by Medstar and another portion by Premier Physicians). This resulted in the Plaintiff not receiving overtime premiums when she worked in excess of 40 hours in individual work weeks.

85. Under the FLSA, Plaintiff was entitled to be paid at the overtime rate for each hour worked in excess of 40 hours each work week at one and one-half times her regular rate of pay.

86. The proper overtime rate is computed by multiplying 1.5 times an employee's regular hourly rate.

87. Premier Physicians and Dr. Kota failed to compensate the Plaintiffs and other similarly situated plaintiffs at the proper overtime rate for all the work they performed in excess of 40 hours per week in violation of the FLSA.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against the Defendants Premier Physicians and Dr. Kota and award all relief available under the law.

**COUNT VI – Illinois Minimum Wage Law**
(against Premier Physicians and Dr. Kota Only)

88. Plaintiff hereby alleges and incorporates her prior allegations.

89. This count arises from Defendants Premier Physicians and Dr. Kota's violation of the overtime compensation provisions of the IMWL, 820 ILCS § 105/1 *et seq.*

90. Under the IMWL, Defendants Premier Physicians and Dr. Kota's were and remain obligated to compensate Plaintiff for all hours worked in excess of 40 hours in any individual work week. Overtime compensation must be paid at a rate of not less than one and one-half times the regular rate of pay.

91. Plaintiff was regularly permitted, encouraged and/or required to work in excess of 40 hours per week but was not compensated at the required one and one-half times his regular rate for such overtime work.

92. By failing to pay overtime compensation due to Plaintiff, Defendants willfully, knowingly and/or recklessly violated the IMWL which requires overtime compensation of one and one-half time the regular rate to be paid.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against the Defendants Premier Physicians and Dr. Kota's and award all relief available under the law.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial on all claims alleged herein

Dated: April 17, 2018

Respectfully submitted,

By: /s/David J. Fish
One of Plaintiff's Attorneys

David Fish
Kimberly Hilton
John Kunze
The Fish Law Firm, P.C.
200 E. 5th Avenue, Suite 123
Naperville, IL 60565
(630) 355-7590

FILED

APR 17 2018

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Suppressed, | ) | |
| | ) | 1:18-cv-02744 |
| | ) | Judge Ruben Castillo |
| | ) | Magistrate Judge Mary M. Rowland |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **FILED IN CAMERA AND** |
| | ) | **UNDER SEAL AND PURSUANT** |
| Suppressed, | ) | **TO THE FALSE CLAIMS ACT** |
| | ) | |
| Defendants. | ) | |

**NOTICE OF FILING**

To:

Jefferson Sessions, Esq.
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, NW, Room 4400
Washington, D.C. 20530-0001

Heather Tuli D'Orazio, Esq.
Illinois Attorney General's Office
100 West Randolph Street
Chicago, IL 60601

Linda Wawzenski, Esq.
Assistant U.S. Attorney, Civil Division
United States Attorney's Office
Northern District of Illinois, Chicago
219 S. Dearborn Street, 5th Floor
Chicago, IL 60604

**PLEASE TAKE NOTICE THAT**, on April 17, 2018, I field with the United States District Court for the Northern District of Illinois, Eastern Division, **RELATOR'S QUI TAM COMPLAINT**, *in camera and under seal*, a true and correct copy of which is attached hereto and is hereby served upon you.

/s/David J. Fish
Attorneys for Plaintiff-Relator

David J. Fish, Esq.
Kimberly Hilton, Esq.
John Kunze, Esq.
The Fish Law Firm, P.C.
200 E. 5th Avenue, Suite 123
Naperville, IL 60563
(630) 355-7590